IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
December 12, 2013 Session

# WILLIAM PAUL LUTTRELL v. BEVERLY PARKER LUTTRELL

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002985-11      Robert L. Childers, Judge**

**No. W2012-02279-COA-R3-CV - Filed January 28, 2014**

In this divorce action, the trial court awarded Wife an absolute divorce, classified and distributed the marital property, and ordered Husband to make child support payments of $1,112 per month. Husband appealed. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed & Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Laura Diane Rogers, Memphis, Tennessee, for the appellant, William Paul Luttrell.

Stevan L. Black and John C. Ryland, Memphis, Tennessee, for the appellee, Beverly Parker Luttrell.

## OPINION

### I. BACKGROUND

William Paul Luttrell ("Husband") and Beverly Parker Luttrell ("Wife") were married on November 28, 1987 in West Point, Mississippi. Gifts from Wife's family boosted the parties' standard of living throughout the marriage. Wife's grandfather started Bryan Foods, which was later acquired by the Sara Lee Corporation. Prior to the marriage, Wife's grandparents made her the beneficiary of the Beverly P. Harrell Trust (the "Trust"), which was funded with stock in the Sara Lee Corporation. At the time of the marriage, the stock had a value of $593,443.85. Over the years, Wife's family added additional gifts of stock and cash with a value of $512,324.39 to the Trust. Throughout the marriage, Wife kept the Trust assets in investment accounts titled solely in her name.

Shortly after the parties were married, they moved to Illinois so that Husband could pursue a Master of Business Administration degree at Northwestern University. While Husband attended graduate school, Wife worked at a preschool until she became pregnant with the parties' first child in 1989. After Husband earned his degree in 1990, he began working for International Paper and the family settled in Memphis, Tennessee. The parties had three more children together,[1] and because of Wife's considerable wealth, Wife was able to be a stay-at-home mother while Husband worked.

With Wife's Trust assets supplementing Husband's income, the family was able to enjoy a high standard of living. The family lived in a wealthy neighborhood and the children were able to attend private schools. In 1996, the parties purchased a home on Birnam Wood Drive in Germantown, Tennessee for $515,000 (the "Birnam Property"). Wife used $290,000 from her investment accounts as a down payment on the home. Meanwhile, the parties used Husband's salary for the majority of their living expenses.

After spending two years at International Paper, Husband left that job and started working as a product manager for Smith & Nephew. Around 2000, Husband left his job at Smith & Nephew due to its strenuous travel demands. After leaving Smith & Nephew, Husband desired to own his own business and considered several options before deciding to open an antiques store. In 2003, the parties purchased commercial property at 7609 Poplar Pike in Germantown, Tennessee (the "Poplar Pike Property") for $315,000 to be the business location of Husband's antiques store. At that time, Wife withdrew $94,000 from the Trust investment accounts for the $60,000 down payment on the property, improvements to the property, and to purchase inventory for the business.

Unfortunately, the antiques store never proved to be particularly profitable. Over time, Wife transferred funds from the investment accounts into the parties' joint bank account to help maintain their standard of living. In 2006, Wife asked Husband to close the antiques store and find another job, but Husband declined to do so. During the economic downturn of 2008 business became even slower, and in 2009 Husband finally began looking for other employment. In 2010, the parties began looking for purchasers for the Poplar Pike Property. At the time of trial, the Poplar Pike Property was still for sale, listed at $639,000.

The parties' marital problems began in 2006 when Wife learned that Husband was having an affair with another woman. Wife initially filed for divorce after discovering the affair, but the parties decided instead to attend counseling and try to save the marriage. Unfortunately, the reconciliation did not last, and Husband filed for divorce in June 2011 citing irreconcilable differences. Wife filed a counter-complaint. In August 2011, Wife

---

[1]At the time of trial, only two of the children were still minors.

moved out of the Birnam Property, using $392,000 from the investment accounts to purchase a home on Enclave Hollow Lane in Germantown (the "Enclave Property"). Husband continued to reside in the Birnam Property. The parties have since listed the Birnam Property for sale, though it had not sold at the time of the trial.

Though the parties were able to resolve most parenting issues in the divorce themselves, division of the parties' property proved to be more contentious. The matter came to trial in April of 2012 and lasted for several days. The trial court awarded Wife an absolute divorce from Husband on the ground of inappropriate marital conduct and divided the parties' property in its final judgment on October 2, 2012. This appeal followed.

## II. ISSUES

Both parties raise several issues for our review. The following issues, as we have restated them, are presented by Husband for our review:

(1)     Whether the trial court erred in the classification and valuation of the parties' assets and liabilities and by failing to make an equitable distribution of the marital property.

(2)     Whether the trial court abused its discretion in calculating child support.

(3)     Whether the trial court erred in finding that the parties reached an agreement that Husband would pay expenses associated with the Birnam Property.

(4)     Whether the trial court erred in denying Husband an award of attorney's fees.

(5)     Whether Husband is entitled to attorney's fees on appeal.

Additionally, Wife raises the following issues, as we have restated them:

(1)     Whether the trial court erred by failing to make an equitable distribution of the parties' marital assets.

(2)     Whether the trial court erred by denying Wife an award of attorney's fees.

(3)     Whether Wife is entitled to attorney's fees on appeal.

### III. Standard of Review

Our review of the trial court's findings of fact is de novo upon the record, accompanied by a presumption of correctness. Tenn. R. App. P. 13(d) (2012). We will not reverse the trial court's findings unless evidence in the record preponderates against them. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). Our review of the trial court's legal conclusions will also be de novo, but without a presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We give great weight to the trial court's determination of witness credibility. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). We will therefore not re-evaluate the trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. Of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

### IV. Discussion

In divorce proceedings, Tennessee courts have the authority to divide the marital property of the parties, but not each individual's separate property. *See* Tenn. Code Ann. § 36-4-121 (2010 & Supp. 2013). Thus, the trial court's first task is to determine whether property is marital property or separate property. *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). The court must give each party their separate property, then divide the marital property equitably. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). The trial court is vested with wide discretion in classifying property as either marital or separate, and its decision is entitled to great weight on appeal. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). We afford the trial court's decision a presumption of correctness, and we will only reverse or modify it if the evidence preponderates against the trial court's decision. *Owens*, 241 S.W.3d at 485.

Tennessee Code Annotated defines marital and separate property as follows:

(b) For purposes of this chapter:
(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. In the case of a complaint for legal separation, the court may make a final disposition of the marital property either at the time of entering an order of legal separation or at the time of entering a final divorce

-4-

decree, if any. If the marital property is divided as part of the order of legal separation, any property acquired by a spouse thereafter is deemed separate property of that spouse. All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property.

(B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

(C) "Marital property" includes recovery in personal injury, workers' compensation, social security disability actions, and other similar actions for the following: wages lost during the marriage, reimbursement for medical bills incurred and paid with marital property, and property damage to marital property.

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

(E) Property shall be considered marital property as defined by this subsection (b) for the sole purpose of dividing assets upon divorce or legal separation and for no other purpose; and assets distributed as marital property will not be considered as income for child support or alimony purposes, except to the extent the asset will create additional income after the division.

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986, compiled in 26 U.S.C., as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121.

Separate property may become marital property through commingling of funds or the doctrine of transmutation. Tennessee courts have addressed those concepts as follows:

> Separate property becomes marital property by commingling if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. Transmutation occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (citations omitted). The party seeking to rebut either of the presumptions has the burden of proving otherwise by a preponderance of the evidence. *Owens*, 241 S.W.3d at 485-86.

### *Classification and Valuation of Trust Assets*

By far the most valuable assets at issue between the parties in this case are the Trust assets, which Wife received from her grandparents. At the time of trial, the Trust assets, which consist mostly of Sara Lee Corporation stock held in investment accounts, were valued at $1,765,962.80.[2] Husband does not dispute that the investment accounts are presumed to be Wife's separate property. However, he contends that he successfully rebutted that presumption at trial and that the Trust assets became marital property under the doctrines of transmutation and commingling.

Husband asserts that the evidence shows the parties intended to treat the Trust as marital property. First, Husband contends that his involvement with managing the

---

[2]This value includes the cost of the Enclave Property, which Wife purchased with funds from the investment accounts in 2011.

investment accounts and developing investment strategies shows that the parties intended the Trust to be marital property. Husband attended meetings with the bankers that managed the investment accounts and communicated directly with them at times through emails and phone calls. Additionally, Husband contends that the parties held the investment accounts out as belonging to both of them during the marriage. Husband points out several instances in the record where Wife referred to the funds as "ours" or references that "we" moved the funds.

Despite Husband's contentions, we conclude that the record shows that Wife never intended to relinquish control over the Trust's investment accounts. Frank Parent, who has been the account administrator and trust officer for the accounts since before the marriage, stated in his deposition that whenever Husband called about transferring funds from the investment accounts, he asked whether Wife approved of the transfer. Mr. Parent testified that he would never transfer funds at the direction of Husband without Wife's approval. Though Husband participated in discussions regarding investment of the Trust's funds, Mr. Parent stated that he never acted on Husband's investment advice. Throughout the marriage, the investment accounts were always titled solely in Wife's name or the name of the Trust, even after the funds were transferred between banks. Perhaps most tellingly, Husband borrowed $20,000 from his mother in 2010 to purchase inventory for the antiques store. At that time, the current divorce proceedings had not begun. If Husband had unfettered access to the investment accounts, as he claims, such a loan would have been unnecessary. Based on those facts, the trial court found that Husband's testimony regarding his access to the investment accounts was not credible. After thoroughly reviewing the evidence, we cannot say that it preponderates against the trial court's finding.

Next, Husband contends that the investment accounts became marital property through commingling of funds. As we noted above, commingling occurs when separate property becomes inextricably mixed with marital property or separate property of the other spouse. *Langschmidt*, 81 S.W.3d at 747. In this case, Wife testified and Husband did not dispute that marital funds were never deposited into the investment accounts. Husband contends that the funds were commingled because the parties filed joint tax returns for many years during the marriage. However, this Court has recently held that filing a joint income tax return does not affect the property rights of spouses. *Estate of Hunt v. Hunt*, 389 S.W.3d 755, 761-63 (Tenn. Ct. App. 2012). Husband contends that by filing joint taxes, the parties' total tax liability was significantly lowered and the financial benefit to the investment accounts was the equivalent of the parties writing a check on their joint account and depositing it directly in the investment accounts. However, the record shows that Wife routinely deposited money from the investment accounts into the joint account to cover any tax liability. That money was considered a gift to the marriage. We do not think that Wife's decision to contribute a portion of the investment account funds to the marriage had any

affect on the funds that remained in the investment accounts.

As an alternative to the transmutation and commingling arguments, Husband contends that because he substantially contributed to the increased value of the Trust during the marriage, the appreciation of the Trust's funds during the marriage should be marital property. Where one party substantially contributes to the preservation and appreciation of separate property, the amount of the appreciation may be considered marital property. Tenn. Code Ann. § 36-4-121(b)(1)(B). Husband argues that by depleting marital assets first, the parties allowed the Trust funds to appreciate. However, the trial court specifically found that during the course of the marriage, Wife contributed over $3,000,000 of her separate property (mostly in dividends from the Sara Lee Corporation stock) to the marriage, while Husband's net contribution was only $494,448. The evidence does not preponderate against its finding. In 1994, Wife used $11,309 from the Trust to pay off Husband's student loans. In 1996, Wife used $290,000 from the Trust as a down payment on the Birnam Property. In 2003, Wife used $94,000 from the Trust to help purchase the Poplar Pike Property and inventory for the antiques store. Husband contends that he contributed to the appreciation of the Trust by using his financial expertise to help manage the funds throughout the marriage. This argument fails, as we have already established that the investment account's account administrator never relied on Husband's investment advice. Even if Husband's contributions did help preserve the investment accounts, substantial contributions to preservation *and* appreciation must be established before appreciation of the separate property can be considered marital property. *Langschmidt*, 81 S.W.3d at 746. We find no link between Husband's actions and the appreciation of Wife's investment accounts. Because we reject each of Husband's arguments that the Trust assets or appreciation of the Trust assets should be considered marital property, we affirm the trial court's ruling that they are Wife's separate property.

### *Classification and Valuation of Other Property*

Husband contends that the trial court erred in the classification and valuation of certain personal property. First, Husband contends that the parties' guitar collection should be his own separate property. Husband asserts that he purchased the guitars using separate assets from a gift he received from Wife's family. It is undisputed that the guitars were purchased during the marriage and therefore are presumed to be marital property. Husband regularly bought and sold guitars during the marriage and was unable to provide any proof that the guitars and musical equipment in his collection at the time of the divorce were separate property. As a result, the trial court had no choice but to declare the entire collection to be marital property pursuant to the doctrine of commingling. Husband fails to offer any evidence that would preponderate against the trial court's finding; we therefore affirm.

Husband also contends that the trial court erred in valuing the guitars. By consent order of the parties prior to trial, Husband was permitted to sell the guitars and other musical equipment of the parties to meet his financial obligations, however that consent order provided that the transactions would be included in the appraisal of the items at trial. At trial, Husband's expert valued the guitar collection at $64,995. Wife's expert valued the guitar collection at $96,890. The trial court found that Husband's expert did not include the equipment sold prior to trial in his appraisal, as was stipulated to in the consent order. Because Wife's expert did account for the value of the previously sold equipment in his appraisal, the trial court adopted the valuation of Wife's expert for the guitar equipment and ordered Husband to pay one half of that amount, or $48,445 from the net proceeds of the sale of the Poplar Pike Property to Wife to represent her interest in the guitar collection. Where valuation evidence is conflicting, trial courts are given a great deal of leeway in placing a value on the property that is within the range of values represented by the relevant valuation evidence. *Owens v. Owens*, 241 S.W.3d 478, 846. Because the trial court here valued the guitar collection within the range of valuation evidence presented, we afford it great weight. Finding no evidence that preponderates against the trial court's conclusion, we affirm its valuation of the guitar collection.

Next, Husband contends that Wife's Ebel watch should be considered marital property rather than Wife's separate property. He argues that the trial court erred by finding the watch to be Wife's separate property although it was purchased with funds from the parties' joint checking account. Wife contends that she purchased the watch to commemorate her thirtieth birthday with money that she received as a gift from her grandparents. Husband also disputes the value of the watch, which the trial court determined to be $6,000.

Wife turned thirty on June 21, 1994. Wife testified that for her thirtieth birthday, her grandparents gave her additional Sara Lee Corporation stock and about $89,322.48 in cash. Wife testified that she purchased the watch in remembrance of her thirtieth birthday and the money her grandparents had given her. On June 14, 1994, Wife transferred $7,300 from her separate investment account into the parties' joint checking account. The next day, Wife wrote a check on the parties' joint checking account to Mednikow Jewelers for $6,855 to purchase the watch. Based on that evidence, the trial court concluded that Wife met her burden of proving that the watch was her separate property. In the absence of evidence that preponderates against the trial court's finding, we decline to reverse it.

Additionally Husband argues that the trial court undervalued the watch. At trial, Husband valued the watch at $11,900. Wife testified that she "kind of" remembered paying $10,000 for the watch, however the only direct evidence of the watch's value was the check for $6,855 written by Wife to Mednikow Jewelers on June 15, 1994. Wife also testified that the watch was broken and had gone down in value since she purchased it. Husband did not

present any further evidence regarding the watch's value. The trial court ultimately found the present value of the watch to be $6,000. Upon review of the limited evidence before us, we cannot say that it preponderates against the trial court's finding.

Finally, Husband takes issue with the court's classification and valuation of Wife's 1/9 interest in a Florida condominium. Wife received the interest in the condominium from her grandmother in 1994. At that time, the 1/9 interest was worth approximately $20,000. At trial, the court determined Wife's interest had appreciated in value to $57,633. The parties do not dispute that the value of Wife's interest in the condominium increased $37,633 during the marriage. However, Husband contends that the appreciation should be marital property because he substantially contributed to the increased value of the condominium. Husband contends that the parties paid at least $13,979 in maintenance, repairs, and expenses for the condominium during the marriage. Wife's sister testified that families who wish to use the condominium are required to pay a quarterly fee to cover utilities and maintenance. The trial court concluded that the parties' payments during the marriage were for the right to use the condominium and did not contribute to any appreciation in its value. We find no evidence that preponderates against the trial court's ruling. We therefore affirm the trial court's ruling that the 1/9 interest in the Florida condominium constitutes Wife's separate property.

### *Equitable Distribution of the Marital Estate*

Once the trial court has determined what property is considered to be part of the marital estate, it must divide the assets of the marital estate equitably. Tenn. Code Ann. § 36-4-121. The equitable division of marital property does not necessarily require that each party take equal shares of the marital estate, but it does require a fair result. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). We give great weight to the trial court's equitable division of the parties' marital property and we "are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).

Tennessee Code Annotated section 36-4-121(c) provides a list of relevant factors that the trial court must consider in making an equitable division of marital property.[3] So long

---

[3] Those factors include:
(1) The duration of the marriage
    (2) The age, physical and mental health, vocational skills, employability, earning
(continued...)

-10-

as the trial court considers all relevant factors, it "is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007). The trial court should weigh and consider the most relevant factors in light of the unique facts of the case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn Ct. App. 2003). With regard to issues of credibility and the weight of testimony, we afford considerable deference to the trial court's findings. *Keyt*, 244 S.W.3d at 327.

In this case the trial court's findings of fact clearly reflect that it considered each of the relevant statutory factors. For instance, the trial court found that the parties had been married for nearly twenty-five years. It noted that both parties were in good physical and mental health. The trial court observed that Wife substantially contributed to Husband's increased earning capacity by taking care of the children and helping to pay off his student loans. The trial court stated that Husband had been willfully and voluntarily underemployed since October 2000. It further noted that Wife contributed more than $3,000,000 to the marriage, whereas Husband's net contribution was about $494,000. Notably, the trial court also found that Wife had separate property worth in excess of $1,772,339, whereas Husband had no separate property. Despite the trial court's thorough analysis of each relevant factor, each of the parties contends that the trial court erred in its distribution of the marital assets.

---

[3](...continued)
capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as a homemaker, wage earner or parent, with the contribution of a party as a homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) The amount of social security benefits available to each spouse; and
> (11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

Husband contends that the trial court failed to consider Wife's dissipation of marital assets by filing separate tax returns when it made its equitable distribution. *See* Tenn. Code Ann. § 36-4-121(c)(5). Dissipation occurs when one spouse wastes marital property, thereby reducing the amount of marital property available for equitable distribution. *Larsen-Ball*, 301 S.W.3d at 235. Typically, dissipation refers to the use of marital funds for a purpose unrelated to the marriage that is intended to "hide, deplete, or divert" marital property. *Id.* (quoting *Altman v. Altman*, 181 S.W.3d 899, 919 (Tenn. Ct. App. 2007)).

Though the parties filed joint tax returns throughout the majority of the marriage, after the parties filed for divorce, Wife filed separate tax returns for 2008, 2009, and 2010. According to Husband, Wife caused a loss to the marriage of $38,908 in extra tax payments and penalties. Husband contends that Wife's act was intentionally calculated to deplete the marital estate. We disagree.

This Court faced a similar situation in *Echols v. Echols*, No. E1999-00619-COA-R3-CV, 2000 WL 688589 (Tenn. Ct. App. May 30, 2000). In that case, Mr. Echols alleged that Ms. Echols's refusal to file joint tax returns was dissipation of the marital estate. *Id.* at *6. Ms. Echols defended her decision to file separately, stating that at the time, she had legitimate concerns that her husband was under-reporting his income. *Id.* The court examined the evidence and found that there was a reasonable basis for Ms. Echols's fear that her husband was under-reporting his income. *Id.* The evidence indicated that Mr. Echols was using his business's corporate funds to pay personal expenses. *Id.* Because Ms. Echols had a reasonable basis to suspect that her husband was illegally under-reporting his income, the court in *Echols* determined that her decision to file separate tax returns did not amount to dissipation of the marriage's assets. *Id.*

The reasoning of *Echols* is instructive in the present case. Wife contends that she filed separate tax returns because she suspected Husband was receiving unreported income from illegal activities. After reviewing the record, we think that there was a reasonable basis for Wife's suspicion, therefore her separate filings were not dissipation of marital assets. Wife testified that in February 2011, she found a sheet of paper indicating that Husband had wired $4,000 overseas to purchase drugs. Wife testified that when she confronted Husband about the sheet of paper, he told her that he could go to jail for it. In October 2011, Wife filed a separate tax return for 2010. In December 2011, Wife filed separate tax returns for 2008 and 2009. At trial, Husband did not deny telling Wife he could go to jail for his purchases, stating instead that he did not recall the conversation. During his deposition, Husband repeatedly invoked his Fifth Amendment privilege against self-incrimination when questioned about his purchase or sale of illegal drugs from overseas. In any event, the trial court found that because Wife paid the additional taxes associated with her separate returns from her separate property, the marital estate did not suffer any loss from Wife's decision.

-12-

Based on the foregoing, we do not think the evidence preponderates against the trial court's decision.

We turn now to Wife's contention that the trial court failed to award her an equitable share of the marital assets. After adding up the total marital assets and debts of the parties, the trial court estimated the value of the marital estate to be $800,659.73. Of that amount, the trial court awarded Husband $601,988.29, or about seventy-five percent, and Wife $198,683.44, or about twenty-five percent. It is apparent from the trial court's order that the trial court carefully considered each of the factors listed in Tennessee Code Annotated section 36-4-121(c) before dividing the marital estate. Though many of the factors indicate the Wife's substantial contributions to the marriage justify a larger award of the marital assets, the trial court clearly weighed the parties' substantial disparity in separate property heavily. Wife's separate property, valued by the trial court in excess of $1,772,339, dwarfs the total value of the parties' marital property. Additionally, the trial court found that Husband did not have any separate property. Though the value of the parties' separate property was just one factor the trial court considered in making its decision, it cannot be denied that, in this particular case, it was especially significant. In light of the foregoing, the division of approximately seventy-five percent of the marital estate to Husband and twenty-five percent to Wife was within the trial court's wide discretion. We therefore affirm the trial court's equitable division of the marital assets.

### *Child Support*

Husband raises three issues regarding his child support obligation. First, he contends that the trial court erred when it found that he was willfully and voluntarily underemployed. Second, Husband contends that the trial court abused its discretion by imputing income to him of $134,000 per year. Finally, Husband contends that the trial court erred by failing to impute additional income to Wife.

Awards of child support are governed by the Tennessee Department of Human Services' Child Support Guidelines, which provide that the trial court may impute additional income to a parent in its calculation of child support if it determines that the parent is willfully and/or voluntarily underemployed or unemployed. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). The finding is based on the theory that parents should not be able to "avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). "A determination of willful and/or voluntary underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support. The determination may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). In making its

determination, the trial court must consider the parent's past and present employment and determine whether the party's choice to accept a lower paying job was reasonable and made in good faith. *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001). Additionally, the court should take into consideration the parent's education, training, and ability to work. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)(II). Whether a parent is willfully and voluntarily underemployed is a question of fact, and we afford the trial court considerable discretion in making its determination. *Willis*, 62 S.W.3d at 738. Thus, we review the trial court's determination with a presumption of correctness. Tenn. R. App. P. 13(d) (2012).

In the instant case, it is clear that Husband has not fully exercised his earning capacity since 2000. That year, Husband left his job in management at Smith & Nephew, where he earned over $100,000 per year, without having another job lined up. After considering several other business options, Husband started operating an antiques importing business in late 2001. In 2003, Wife contributed $94,000 from her separate investment accounts as a down payment on a physical location for the antiques store and to purchase additional inventory. Unfortunately, the antiques store did not prove to be a profitable venture. According to Husband's own testimony, in its most profitable year, the business only made about $15,000. Around 2006, Wife asked Husband to close the business and look for another job. Husband declined and continued to operate the business, which subsequently suffered further losses following the 2008 economic downturn. Though Husband has a college degree from Millsaps College and a Master of Business of Administration degree from Northwestern University, since 2000 he has shunned traditional employment to pursue other interests that have resulted in earnings far below his earnings capacity. Upon review of the record, we do not find any evidence that preponderates against the trial court's holding that Husband is willfully and voluntarily underemployed.

When a parent is found to be willfully and voluntarily underemployed, the Child Support Guidelines provide that his or her child support obligation may be based on potential income rather than actual income. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). The additional income to be allocated to the parent is a question of fact to be determined using evidence of the parent's past and present employment and the parent's education and training. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II). As noted above, Husband has a Master of Business Administration degree from Northwestern University. With regard to past employment, the trial court found that Husband was employed as the Group Manager of Business Development at Smith & Nephew from 1992 to 2000. Husband's income during his last two years of employment with Smith & Nephew was $103,788 in 1999 and $164,044 in 2000. The trial court averaged Husband's income from those two years and determined that Husband was capable of earning $134,000 per year. Husband contends that the trial court erred in making its finding because there was no proof presented at trial that he could get a job earning $134,000. Instead, Husband stipulated at trial that his child support should

be calculated using a salary of $60,000.

This Court addressed a similar situation in *Garfinkel v. Garfinkel*, 945 S.W.2d 744 (Tenn. Ct. App. 1996). When the parties met, Mr. Garfinkel had a Master's degree in physics and earned about $40,000 per year in that field. *Id.* at 746. In 1983, Mr. Garfinkel quit his job and his income was reduced to about $10,000 per year which he received from rental properties. *Id.* In 1995, the parties divorced. *Id.* During the divorce proceedings, the trial court awarded Ms. Garfinkel custody of the parties' minor children and set Mr. Garfinkel's child support obligation based on his potential earning capacity, as evidenced by his income from over ten years earlier. *Id.* at 746-47. This Court affirmed, holding that the trial court "correctly considered [Mr. Garfinkel's] educational background and earnings prior to his decision to discontinue employment, and calculated his child support obligation based on his potential income." *Id.* at 748.

The plain language of the Child Support Guidelines requires the trial court to consider evidence of Husband's previous employment in determining his potential income. Ignoring such evidence could lead to the same result that imputing income is designed to avoid. *State ex rel. Rion v. Rion*, No. 01A01-9704-CV-00194, 1997 WL 796212, at *2 (Tenn. Ct. App. Dec. 31, 1997). Husband is well-educated and his past work experience shows that he is capable of earning a high salary. We find that the trial court did not err in imputing income to Husband based on his past earnings.

Husband also contends that the trial court erred by not imputing additional income to Wife. First, Husband contends that Wife is willfully and voluntarily underemployed. Because there is no presumption that a parent is willfully underemployed, Husband has the burden of proving it. *Massey*, 315 S.W.3d at 796. He has failed to do so. The facts show that Wife worked at a day school until becoming pregnant with the parties' first child in 1988. Since that time, Wife has worked several part-time jobs, but her primary responsibility in the marriage has been that of a homemaker. We note that the Child Support Guidelines clearly reflect a policy supporting a parent's reasonable decision to stay home and care for children:

> The following factors may be considered by a tribunal when making a determination of willful and voluntary underemployment:
>
> . . . .
>
> (III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life.

-15-

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)(III); *Massey*, 315 S.W.3d at 796. Here, the trial court found that pursuant to an agreement of the parties, Wife primarily contributed to the marriage as a homemaker and mother. Husband has not presented any evidence that Wife's choice was unreasonable.

Finally, Husband contends that the trial court erred by failing to impute income to Wife based on her separate wealth. There is no dispute that Wife derives a great deal of wealth from her stock ownership. When a parent owns substantial non-income producing assets, the court may impute income based on a reasonable rate of return on the assets. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(III). In the past, this Court has granted trial courts considerable discretion in determining whether imputation of income for non-income producing assets is warranted. *See Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *5 (Tenn. Ct. App. Apr. 2, 2009). We do not find that the trial court abused that discretion in declining to impute additional income to Wife. Based on the foregoing, we find no error in the trial court's determination of Wife's child support obligation.

### *Letters Admitted at Trial*

During the trial, Wife sought to establish that upon moving out of the Birnam Property, the parties reached an agreement that Husband would take sole responsibility of expenses related to the Birnam Property. Wife testified that the parties agreed Husband would pay those expenses as long as he was able. However, when Husband was questioned about the agreement, he denied its existence and stated that he had not heard of any such agreement prior to trial. On cross-examination, Wife's counsel sought to impeach Husband's testimony by introducing two pre-trial letters into evidence that referenced such an agreement. The first letter was a proposed consent order from Wife's counsel to Husband's counsel, the second letter was the reply of Husband's counsel. Over the objection of Husband's counsel, the trial court admitted two letters into evidence.

The first letter, dated July 21, 2011, is from Wife's counsel to Husband's former counsel. The letter, sent just prior to Wife's move out of the marital residence, contains a proposed consent order regarding the payment of expenses for the Birnam Property. On its cover page, the letter states that, "My client advises me that her husband and she have agreed to the terms set forth herein." Among other things, the enclosed proposed consent order states that Husband will pay all expenses of the Birnam Property out of his separate income to the extent he is able to. The second letter, dated August 2, 2011, is a reply to the first letter and was sent by Husband's then-counsel. The letter simply states that Husband has a few proposed provisions that will be sent separately.

Husband's counsel immediately objected to the letters' admission at trial, however his objection was overruled and the letters were admitted. Subsequently, in its findings of fact, the trial court relied on the letters in finding that Husband's testimony on the subject was not credible. The court stated:

> While [the letter from Husband's counsel] mentioned that she had a few proposed revisions to the Consent Order, the letter did not deny that the parties had discussed and agreed that Wife would purchase a separate residence with her separate funds and that Husband would continue to reside at the Marital Residence and be responsible for the expenses of the residence.

> The Court finds that Wife's testimony regarding the parties entering into the subject agreement was credible and Husband's testimony was not credible.

Based on that finding, the trial court concluded that Husband was estopped from receiving any contribution from Wife for expenses of the Birnam Property.

On appeal, Husband contends that the trial court improperly relied on the letters as proof that the parties reached an agreement regarding the expenses of the Birnam Property and that his testimony to the contrary was not credible. Primarily, Husband argues that because the proposed consent order was never signed, there was clearly no agreement. However, the trial court recognized the consent order was not entered before finding that Husband's denial of an agreement was not credible. The trial court reached its conclusion because it noted that in the first letter, Wife's counsel stated that the consent order was being finalized pursuant to a previous agreement of the parties, the existence of which Husband's counsel did not deny in the reply letter. The letters showed that prior to trial, Wife claimed the agreement existed and Husband did not deny it; only at trial did Husband deny the agreement. Based on that evidence, the trial court found Husband's testimony to not be credible. We afford great weight to the trial court's credibility determination and see no clear and convincing reason to overturn it. Additionally, there is no other evidence that preponderates against the trial court's finding that such an agreement existed. We therefore affirm the trial court's ruling holding Husband responsible for expenses related to the Birnam Property pending its sale.

### *Attorney's Fees*

Each of the parties contends that the trial court erred by not awarding their respective attorney's fees. The decision whether or not to award attorney's fees is within the sound discretion of the trial court. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011). We find no abuse of discretion in the denial of attorney's fees to both parties.

Husband contends that the trial court improperly determined that he waived his claim for attorney's fees because he waived his claim for alimony prior to trial. An award of attorney's fees in a divorce case constitutes alimony in solido. *Id*. Prior to trial, Husband expressly stipulated that he would not seek alimony from Wife. Thus, the trial court did not abuse its discretion in denying attorney's fees to Husband.

Wife contends that the trial court erred by not awarding her attorney's fees though it expressly found that "a significant portion of Wife's attorney fees and expenses were incurred because of the lack of candor and honesty on the part of Husband and the unreasonable positions that he advanced in this litigation." Though we recognize that a large portion of Wife's fees may be attributable to Husband's actions, we affirm the ruling of the trial court. One of the most important factors in determining whether attorney's fees should be awarded in a divorce case is the need of the economically disadvantaged spouse. *Owens v. Owens*, 241 S.W.3d 478, 494 (Tenn. Ct. App. 2007). Based on the facts of this case, it is clear to us that Wife is not economically disadvantaged. We therefore affirm the ruling of the trial court.

Both parties also request that this Court award their attorney's fees and costs associated with the appeal. After considering the request, we decline to award attorney's fees to either party.

## V. HOLDING

Based on our review of the record and the applicable legal principles, we affirm the judgment of the trial court. The costs of this appeal are taxed to Appellant, William Paul Luttrell and his surety, for which execution may issue.

_____
DAVID R. FARMER, JUDGE